JOHN M. MORAN, Respondent, *v.* THE RACINE WAGON COMPANY, Appellant.

*An employer not an insurer — care as to his building and machinery — falling of an elevator — proof of its being out of repair.*

An employer is not an insurer of the safety of his building nor of the machinery therein, but is simply bound to exercise due care that they shall be safe, and before an employee can recover for injuries sustained he must show that the employer failed to discharge his duty in this respect.

In an action brought to recover damages for personal injuries sustained by the falling of an elevator, the plaintiff must prove not only that the elevator was out of repair, but also that the defendant, his employer, negligently suffered it to be so.

Evidence of the falling of an elevator is sufficient to warrant a jury in finding that it was out of repair, if there is evidence that no one had negligently left the elevator without throwing off the power.

APPEAL by the defendant, The Racine Wagon Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the city and county of New York on the 25th day of February, 1893, upon the verdict of a jury rendered at the New York Circuit, and also from an order entered in said clerk's office on the 21st day of March, 1893, denying the defendant's motion for a new trial made upon the minutes.

*Charles M. Earle,* for the appellant.

*John J. Delany,* for the respondent.

FOLLETT, J.:

This action is brought by an employee against his employer to recover damages for a personal injury, caused, it is alleged, by the neglect of the defendant to provide a safe elevator and keep it in repair. The Lorillard estate is the owner of a building completed in 1890, on lots Nos. 151 and 153 South Fifth avenue, which was leased to Frankenthal Brothers, who sublet to the defendant the store floor and basement of the building, "including the steam heat and elevator usage." The defendant entered into possession on February 1, 1890, but the building was not fully completed until May or June following, during which months the elevator was put in by the estate for the use of the defendant. The carriage of the elevator consists of a platform about twelve feet long by six feet wide suspended by four cables and runs between the basement and the store floor, a distance of about nine feet. The elevator was kept in place by guides which extended from the floor of the basement to the store floor, but not above, as it was not designed to pass that floor. It is for freight, not for passengers, and was operated by steam which was furnished by Frankenthal Brothers, who employed the engineer. The defendant used the first floor and basement for the storage and sale of wagons.

September 29, 1890, the plaintiff, who had been employed by the defendant five or six months, entered the basement for the purpose of removing a wagon. In going to the place where it was stored he passed underneath the elevator which fell upon him from the second floor, inflicting severe and permanent injuries. The elevator was operated by defendant's employees, no particular person hav-

ing charge of it. In the language of the plaintiff, "Everybody ran the elevator. I did myself. I didn't run it quite as much as anybody else. The men who worked there, Tom Considine, or any one who worked in there, they used the elevator."

The cause of the fall of the elevator is not clearly established by the evidence. The elevator was not inclosed in a shaft, but was open on all sides. There is some evidence that it was so adjusted that the platform, instead of stopping, as was designed, even with the store floor, would sometimes rise five or six inches above it, and when it came down, instead of passing through the aperture, one side or end of it would catch on the floor, and, if the connection with the power were not shut off, the drums around which the cables were wound would continue to revolve, leaving the cables slack, and if, by accident or otherwise, the platform of the elevator slipped from the floor it would fall to the floor of the basement. In case the check rope was pulled in time the elevator could be stopped at any point, and would not rise above the level of the floor.

There is no evidence that the plaintiff ever discovered any defect in the construction of the elevator or knew that it was out of repair, nor is there any evidence which tends to show that the defendant's superintendent knew or should have known that the elevator was defective in design or construction, or that it was out of repair. The only evidence that the elevator had ever failed to work properly was given by John Sodan and Thomas Considine, employees of the defendant. The former was called by the plaintiff and testified: "Q. Did you see the elevator after it had fallen on John Moran? A. No; I seen it falling twice before it fell on John Moran; it came near killing me. It took off the frame going down; the north side catched it, and then it went off on a slope, and if you went to check it you were afraid; on the northwest end where the brake was, the check was on the northwest end. I seen it plain with my eyes. The check was in the northwest end, and it stood in a foot under the elevator on the north side, and of course you had to run under the elevator to stop it. If you didn't you couldn't get at it any other way. The men had to run under the elevator to stop it; you couldn't do it any other way. The check line ran down through the platform of the elevator. You had to check it. When you were going down you pulled down the check

and when you were going up you pulled it so (illustrating).   Q. On the first occasion when you saw this elevator fall describe how it happened?   A. There were two men working there and this elevator fell down.   I was just working on carriages over the elevator at the same time.   I ran to it and seen it, and then Mr. Smith went and got this Mr. Pinney to print letters underneath that elevator that any man that would leave anything under the elevator why he would be fined or discharged.   This is all I have to say.   Then the elevator fell that time in March.   That was the only regulation that was made.   Then it fell again in February, and I was under it at the same time, and only that I had God's blessing I would be killed. That was in February, 1890.   I will tell you how the elevator acted when it was in operation.   If it went three inches above the floor it struck on the frame, and in coming down it went off on a slope — come right down on a slope."

Werner, who put up the elevator, testified that it was not done until May or June, 1890, so it is not probable that it was out of repair in February and March before.

Considine testified: " Q. Didn't you notice that that elevator would veer from side to side?   A. Well a little, when there was a heavy load on it.   Q. And as it went up beyond the floor of the elevator it was likely to catch on the floor?   A. Well, it did catch once or twice and they had it fixed.   Q. You have seen it there? A. I didn't see it, but I heard she was fixed.   [Objected to.   Stricken out.]   A. No, sir.   Q.   But you have seen it catch on the floorings? A. No, sir; but I heard."

This evidence has no probative force as the witness neither saw the elevator work defectively nor did he see it repaired; he simply heard that it had caught on the floor, and that it had been fixed. The only person about the premises who represented the defendant, or who was engaged in discharging master's duties, was the superintendent, and there is no evidence that he was incompetent; that he had actual knowledge of any defect in the construction or operation of the elevator, nor is there sufficient evidence to authorize the jury to find that he was negligent in not having discovered some defect in its operation.   There is no evidence tending to show when or by whom the elevator was last used before the happening of the

accident. It is urged that the fact that the elevator fell is sufficient to warrant the jury in finding that it was out of repair. Assume this to be so, and it would be so had there been any evidence that some co-employee had not been negligent and left it without throwing off the power, which was not shown.

The plaintiff was bound to prove more than that the elevator was out of repair; he was bound to show that the defendant negligently suffered it to be so, and this he utterly failed to do. An employer is not an insurer of the safety of his building, nor of the machinery, but is simply bound to exercise due care that they shall be safe, and before an employee can recover for injuries sustained he must show that the master failed to discharge his duty in this respect.

Without considering the question of contributory negligence, we think the evidence insufficient to sustain the verdict, and that the judgment and order should be reversed, and a new trial granted, with costs to the appellant to abide the event.

VAN BRUNT, P. J., and PARKER, J., concurred.

Judgment and order reversed and new trial granted, with costs to the appellant to abide the event.